CARNES v SHELDON

Docket No. 47352. Submitted March 9, 1981, at Detroit.—Decided September 9, 1981.

Bonnie L. Carnes brought an action against Charles D. Sheldon, seeking an equitable division of property held by the defendant and for custody of the defendant's minor child by his former marriage. Constance Ward, the child's natural mother, appeared and testified. Following trial, Wayne Circuit Court, Roman S. Gribbs, J., denied both requests, granted judgment for defendant, and granted custody of the child to her natural mother. Plaintiff appeals. *Held:*

1. The record reveals that the trial court's findings of fact relative to lack of the existence of an express agreement regarding a division of property were supported by the evidence presented. In addition, plaintiff failed to move for a new trial on the ground that the decision of the court was against the great weight of the evidence, thus precluding review of this issue on appeal.

2. The trial court properly held that no contract implied in fact or law existed and that any equitable relief regarding the division of property of unmarried cohabitants should be fashioned by the Legislature.

3. The trial court erred in failing to specifically make findings

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*
[2] 4 Am Jur 2d, Appeal and Error § 841.
[3] 52 Am Jur 2d, Marriage §§ 53-61, 109.
[4] 12 Am Jur 2d, Breach of Promise §§ 13-20.
[5] 17 Am Jur 2d, Contracts § 184.
[6] 52 Am Jur 2d, Marriage § 112.
  Recovery for services rendered by persons living in apparent relation of husband and wife without express agreement for compensation. 94 ALR3d 552.
[7] 52 Am Jur 2d, Marriage § 115.
[8] 24 Am Jur 2d, Divorce and Separation § 812.
  42 Am Jur 2d, Infants §§ 43, 57.
[9] 4 Am Jur 2d, Appeal and Error § 136.
  24 Am Jur 2d, Divorce and Separation § 791.
  42 Am Jur 2d, Infants §§ 43, 56.

relative to each of the factors pertaining to the best interest of the child as enumerated in the Child Custody Act, requiring remand for a new custody hearing for such findings and consideration of any additional evidence relevant to the issue of custody.

Affirmed in part, reversed in part, and remanded.

1. MOTIONS AND ORDERS — NEW TRIALS — VERDICTS — APPEAL — PRESERVING QUESTION — COURT RULES.

A party to an action may raise the claim that the verdict or decision in the action is against the great weight of the evidence by moving for a new trial, and where such motion is not made the claim is not preserved for appeal (GCR 1963, 527.1).

2. APPEAL — FINDINGS OF FACT — COURT RULES.

The Court of Appeals will not substitute its judgment relative to findings of fact for that of a trial court sitting as the trier of fact unless the findings of the trial court are clearly erroneous (GCR 1963, 517.1).

3. HUSBAND AND WIFE — COMMON-LAW MARRIAGE — PROPERTY RIGHTS — STATUTES.

Common-law marriages are no longer recognized as valid in Michigan and thus property rights afforded a legally married couple are not extended to persons engaged in a meretricious relationship (MCL 551.2; MSA 25.2).

4. HUSBAND AND WIFE — BREACH OF CONTRACT TO MARRY — ACTIONS — STATUTES.

Civil causes of action for a breach of contract to marry are abolished in Michigan (MCL 551.301; MSA 25.191).

5. CONTRACTS — CONSIDERATION — MERETRICIOUS RELATIONSHIPS.

Contracts made in consideration of meretricious relationships will not be enforced in Michigan; however, the existence of such a relationship will not render all agreements between the parties illegal; where there is an express agreement to accumulate or transfer property following a relation of some permanence, and an additional consideration is provided, the consideration will be held to be independent.

6. CONTRACTS — IMPLIED CONTRACTS — GRATUITOUS SERVICES — QUANTUM MERUIT.

A contract for services of a commerical nature entered between persons living together in a family relationship will be implied in fact upon establishment that at the time at which the services were rendered the renderer expected to receive and the

beneficiary of the services expected to pay wages therefor; absent such proof, a presumption of gratuity will overcome a claim based on a theory of *quantum meruit.*

7. HUSBAND AND WIFE — PUTATIVE SPOUSES — PROPERTY RIGHTS.

A spouse who, because of the concealment of material facts relative to the legality of a marriage by the other spouse, discovers that no legal marriage exists, may be permitted to recover a portion of the property accumulated during the period of cohabitation.

8. PARENT AND CHILD — CHILD CUSTODY — MODIFICATION OF ORDERS — STATUTES.

An order awarding child custody, once entered, should not be modified or amended absent the presentation of clear and convincing evidence that such modification would be in the best interest of the child as determined by an analysis of and findings of fact relative to the specific factors enumerated in the Child Custody Act (MCL 722.23; MSA 25.312[3]).

9. PARENT AND CHILD — CHILD CUSTODY — APPEAL — FINDINGS OF FACT — CONCLUSIONS OF LAW.

The Court of Appeals reviews child custody cases *de novo;* however, such review is meaningful only where the lower court has made proper findings of fact and conclusions of law, and where the lower court fails to make such findings the case will be remanded for a new child custody hearing to consider all evidence relative to the issue of custody (MCL 722.23, 722.28; MSA 25.312[3], 25.312[8]).

*Egnor, Hamilton & Muth* (by *Walter K. Hamilton* and *Melanie J. Dunshee),* for plaintiff.

*Rowe, Talon & Jones, P.C.,* for defendant.

Before: V. J. BRENNAN, P.J., and M. J. KELLY and D. C. RILEY, JJ.

D. C. RILEY, J. Plaintiff, Bonnie Lee Carnes, appeals as of right from a judgment rendered by a Wayne County Circuit Court judge denying her request for an equitable division of property held by defendant, Charles D. Sheldon, and denying her

request for the custody of defendant's minor child, Mary Ellen Sheldon.

Prior to 1967, defendant was married to Constance Sheldon (now Constance Ward). Of this marriage four children were born, one of whom is Mary Ellen, the subject of the present custody dispute. Constance left defendant in 1967 and did not take the children with her. Shortly thereafter, defendant became acquainted with plaintiff, who was also separated from her husband, and who was the mother of three children. In May, 1967, plaintiff and two of her children moved into defendant's house with defendant and his children. The move was prompted by plaintiff's need for a place to live and defendant's need for someone to care for his children. In 1968, defendant obtained a divorce from his wife and was granted custody of all four children.

Plaintiff was unemployed at the time she moved in with defendant and remained so until September, 1970, when she worked part-time as a school bus driver. In 1972, her status was that of a full-time driver. For the most part, plaintiff continued at this job from 1972 through 1979, either part- or full-time, although she did not collect unemployment compensation for the 1974-1975 school year.

At about the time plaintiff began working in 1970, the defendant bought a new home into which plaintiff, defendant, and the children moved. According to plaintiff, defendant had been anxious about the bills which would accompany the purchase of a new home and that she obtained her job in order to help pay the bills so as to quell defendant's anxieties. Plaintiff testified that her wages, which she received biweekly, were used to pay utilities and to purchase food. She then would give the balance to defendant, who, in turn, would

tender back to plaintiff an amount sufficient to cover the next week's bills. Plaintiff testified that she does not know what defendant did with the money left over.

Plaintiff testified that from the beginning, and at various times during her relationship with defendant, she was told by defendant that they would get married as soon as her divorce from Mr. Carnes was final. Plaintiff's divorce, funded by defendant, was obtained some time in 1977. Plaintiff testified that defendant changed his story after her divorce, saying that she was "rusing" him and that he did not trust her. Defendant's refusal to marry her ultimately led to the demise of the relationship.

At first, plaintiff testified that she and defendant never held discussions pertaining to a division of property between them. Later she testified that, while there had been discussions on this subject, there was never any agreement that any of the property they accumulated would be divided between herself and defendant. She testified that "[h]e's always felt everything was his and nothing was mine * * *".

In addition, plaintiff testified that at the children's school she was known as Bonnie Sheldon and that the school principal referred to her as Sheldon. Defense counsel, however, produced a letter from the school principal addressed to Mrs. Bonnie Carnes. Plaintiff's driver's license and social security card were in the name of Carnes, and the parties' tax returns were filed separately. Plaintiff's bank accounts were in her name only. Plaintiff made no payments on the house, which was in defendant's name only. Defendant had a credit card, but plaintiff did not have access to it. Although defendant sometimes purchased items

for plaintiff using the card, he told her that she would have to reimburse him for the cost of purchasing such items.

Defendant testified that there was no agreement to share his property with plaintiff and that he never promised to place title to any of his property in her name. According to defendant, throughout their relationship he always told plaintiff that he "couldn't see getting married because I couldn't see a woman changing her mind and taking half of what you own just because she decides she don't want you anymore * * *". Defendant testified that plaintiff offered to go to a lawyer to sign an agreement stating that she would receive no property in the event of a divorce. Plaintiff admitted that she made this offer.

On April 24, 1979, plaintiff filed the instant suit, seeking an equitable division of the property accumulated during the years she and defendant lived together and seeking custody of Mary Ellen Sheldon.

The trial judge granted custody of the child to its natural mother, Constance Ward. With respect to her claim for an equitable distribution of property, the court held that plaintiff had failed to sustain her burden of proving that an express agreement existed between the parties regarding the ownership of personal and real property accumulated during their years of unmarried cohabitation. The court noted that plaintiff's claim of an express agreement was based in part on asserted promises by the defendant to marry (and thus share property accumulated from joint efforts) in the future. The trial court found that defendant did not make such a promise and on this point found defendant's testimony credible. Further, the court denied recovery on plaintiff's implied con-

tract theory holding that implied contracts in this setting have been neither recognized by case law nor authorized by the Legislature.

Plaintiff first argues that the lower court's finding that plaintiff failed to prove the existence of an express agreement is "contrary to the evidence". Since this issue concerns the weight of the evidence, it has not been properly preserved for appeal because plaintiff did not file a motion for a new trial.

" 'Under GCR 1963, 527.1, where the losing party claims that a verdict of a jury or decision of a judge is against the great *weight* of the evidence he may raise that claim by a motion for a new trial. Such a motion is addressed to the discretion of the trial judge and, accordingly, if such a motion is not filed, such a claim is not preserved for appellate review.' " *Arnsteen v U S Equipment Co,* 52 Mich App 177, 179; 217 NW2d 61 (1974), quoting *Arnsteen v U S Equipment Co,* 390 Mich 776 (1973).

Furthermore, our review of the record convinces us that the trial court's findings of fact are supported by the evidence. This Court will not substitute its own judgment on factual questions in a nonjury case for that of the trial court unless the facts clearly indicate that an opposite result must be reached. *In re Leonard Estate,* 45 Mich App 679; 207 NW2d 166 (1973), GCR 1963, 517.1. In the instant case we cannot say that the judge should have reached an opposite result. Plaintiff so much as admitted during trial that there was no express agreement with respect to a division of property. In addition, plaintiff's credibility on this issue seriously was weakened by her contradictory and equivocal testimony. For all these reasons, we reject plaintiff's contention that she proved an express agreement at trial.

Alternatively, plaintiff contends that the evidence supports recovery on the basis of either a contract implied in law or implied in fact.

By statutory enactment in Michigan, common-law marriages are valid only if contracted before January 1, 1957. MCL 551.2; MSA 25.2, *People v Stanford,* 68 Mich App 168; 242 NW2d 56 (1976). Since that time, Michigan has refused to recognize such marriages with the result that the property rights afforded a legally married couple have not been extended to those engaged in meretricious relationships. Michigan has also abolished the civil cause of action for breach of contract to marry. MCL 551.301; MSA 25.191.

This state will not enforce contracts made in consideration of meretricious relationships. In *Tyranski v Piggins,* 44 Mich App 570; 205 NW2d 595 (1973), however, this Court recognized that the existence of a meretricious relationship does not render all agreements between the parties illegal. In *Tyranski, supra,* 573-574, the Court said:

"But where there is an express agreement to accumulate or transfer property following a relationship of some permanence and an additional consideration in the form of either money or of services, the courts tend to find an independent consideration."

To the extent the rule announced in *Tyranski* concerns an express oral agreement entered into during the course of a meretricious relatiosnhip, it is inapplicable to plaintiff's implied contract claim.

With respect to implied contracts, only one case in Michigan has recognized a cause of action based upon a contract implied in fact in the context of a meretricious relationship. In *Roznowski v Bozyk,* 73 Mich App 405; 251 NW2d 606 (1977), the defendant owned and managed a resort which had a

tavern on its premises. The plaintiff previously had worked as a cocktail waitress in other local establishments but in 1968 moved into defendant's home, whereupon the parties began living together as husband and wife. She aided the defendant in operating his resort, including painting and cleaning the cabins and working in the bar. In addition, plaintiff performed most of the domestic chores in the home. In return, the defendant paid all of their expenses, including upkeep of their home, the plaintiff's insurance premiums, car payments, clothing, food, and medical bills.

In 1974, the relationship deteriorated, the parties split up, and plaintiff commenced suit claiming wages under an alleged express contract of employment entered into at the time she moved in with the defendant. She also sought recovery for the value of the services received by the defendant on a theory of implied contract. The trial court found that the plaintiff had not proved an express contract and further found that an employer-employee relationship did not exist. The court did find that the defendant was benefited by the plaintiff's services in connection with his tavern business and that she was entitled to recover for this. The trial court, significantly, excluded the plaintiff's claim for services rendered in the home, finding that these were gratuitous. See, generally, Anno: *Recovery for services rendered by persons living in apparent relation of husband and wife without express agreement for compensation,* 94 ALR3d 552.

On appeal, the defendant argued that, absent proof of an express agreement, the services rendered by plaintiff must be presumed to have been gratuitous. This Court disagreed, stating that the presumption of gratuity may be rebutted where it

is established that when the services were rendered the plaintiff expected to receive and the defendant expected to pay wages therefor. The Court held that in order to recover the plaintiff must establish a contract implied in fact, which requires proof of the expectations of the parties.

"Without proof of the expectations of the parties, the presumption of gratuity will overcome the usual contract implied by law to pay for what is accepted. *Weessies v Van Dyke's Estate,* 159 Mich 180, 183; 123 NW 608 (1909). *Cf. King v First Michigan Bank & Trust Co of Zeeland,* 11 Mich App 144; 160 NW2d 721 (1968). The issue is a question of fact, to be resolved by consideration of all of the circumstances, including the type of services rendered, duration of services, closeness of relation of the parties, and the expressed expectations of the parties." *Roznowski, supra,* 409.

The Court held that there was more than sufficient evidence to present a question of fact as to the parties' expectations and, therefore, granted the plaintiff a new trial. As noted, the trial court had excluded the plaintiff's claim for services rendered in the home as gratuitous, and this Court did not alter that exclusion.

*Roznowski* establishes a theory of recovery pursuant to a contract implied in fact under circumstances similar to those in the instant case. *Roznowski* is distinguishable from the instant case for several reasons, however. There the plaintiff sued for wages or for the value of services rendered, whereas, in the instant case, plaintiff does not ask for wages and has not alleged that she expected them. In addition, the *Roznowski* Court did not extend the principles of contracts implied in fact to household services. The plaintiff was allowed to recover only for services of a commercial nature.

In the instant case, plaintiff's services to defendant were only of a household nature.

The courts of this state have been willing to grant equitable relief, in certain circumstances, to putative spouses. In cases involving putative spouses, one or both of the parties mistakenly believe in good faith that they are legally married, only to discover at a subsequent date that they are not. In *Walker v Walker,* 330 Mich 332, 335; 47 NW2d 633 (1951), the Court announced the principle that in the putative spouse situation a concealment of material facts by one spouse may constitute actionable fraud and permit the defrauded spouse to recover a portion of the property accumulated during the period of cohabitation.

In the instant case, despite the fact that plaintiff concedes that both parties knew that they were not married legally to each other, she argues that there was fraud present here because defendant promised to marry her but refused to do so. We reject this contention for several reasons. First, the trial court's finding that defendant did not promise to marry plaintiff is supported by the evidence. Second, plaintiff's unilateral expectation of marriage cannot be attributed to the defendant as a fraudulent act on his part. Third, the parties were not putative spouses. Finally, plaintiff is essentially asking for relief based on a breach of promise to marry, an action which has been specifically abolished by legislative fiat.

Further, plaintiff asks us to fashion remedies implied in law, similar to those suggested by the California Supreme Court in the now famous case of *Marvin v Marvin,* 18 Cal 3d 660; 134 Cal Rptr 815; 557 P2d 106 (1976), where the court suggested that the judiciary should begin formulating remedies appropriate to nonmarital relationships based

on the presumption that cohabitants intend " 'to deal fairly with each other' ". *Id.,* 683. The court held that, in the absence of an express agreement, the courts should inquire into the conduct of the parties to determine whether the conduct demonstrates an implied contract, an agreement of partnership or joint venture, or some other tacit understanding of the parties. The court further held that remedies such as *quantum meruit,* constructive trusts, or resulting trusts may be employed in the context of unmarried cohabitants.

The trial court, in the case at bar, held that Michigan does not allow such recovery and further held that it would be against the public policy of this state to do so. We agree with the trial judge.

In a New York decision, *McCullon v McCullon,* 96 Misc 2d 962; 410 NYS2d 226, 231 (1978), the court, in discussing *Marvin,* stated as follows:

"As Justice Tobriner stated in his decision, the *Marvin* discussion was not intended to equate unmarried cohabitation with married couples or create common law marriage. What *Marvin* did was give the nonmarital partners, 'the same rights to enforce contracts and to assert her equitable interest in property acquired through her effort *as does any other unmarried person.'* " (Emphasis in orgiinal.)

In a recent Illinois decision, *Hewitt v Hewitt,* 77 Ill 2d 49, 57-58; 394 NE2d 1204 (1979), the Illinois Supreme Court, in a well-written and comprehensive opinion, stated the problem somewhat differently:

"The issue of unmarried cohabitants' mutual property rights, however, as we earlier noted, cannot appropriately be characterized solely in terms of contract law, nor is it limited to considerations of equity or fairness as between the parties to such relationships.

There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships. Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage. Will the fact that legal rights closely resembling those arising from conventional marriages can be acquired by those who deliberately choose to enter into what have heretofore been commonly referred to as 'illicit' or 'meretricious' relationships encourage formation of such relationships and weaken marriage as the foundation of our family-based society? In the event of death shall the survivor have the status of a surviving spouse for purposes of inheritance, wrongful death actions, workmen's compensation, etc.? And still more importantly: what of the children born of such relationships? What are their support and inheritance rights and by what standards are custody questions resolved? What of the sociological and psychological effects upon them of that type of environment? Does not the recognition of legally enforceable property and custody rights emanating from nonmarital cohabitation in practical effect equate with the legalization of common law marriage * * *?"

We are of the opinion that public policy questions of such magnitude are best left to the legislative process, which is better equipped to resolve the questions which inevitably will arise as unmarried cohabitation becomes an established feature of our society. While the judicial branch is not without power to fashion remedies in this area, see, e.g., *Tyranski, supra, Roznowski, supra,* and *Walker, supra,* we are unwilling to extend equitable principles to the extent plaintiff would have us do so, since recovery based on principles of contracts implied in law essentially would resurrect the old common-law marriage doctrine which was specifically abolished by the Legislature. Although, as previously noted, the *Marvin* court

denied that the effect of its decision would be to resurrect the principle of common-law marriages, commentators have been less certain. Quoting from *Hewitt, supra,* 65-66:

" '[T]he effect of these cases is to reinstitute common-law marriage in California after it has been abolished by the legislature.' (Clark, *The New Marriage,* Williamette L J 441, 449 (1976). *'[Hewitt]* is, if not a direct resurrection of common-law marriage contract principles, at least a large step in that direction.' Reiland, *Hewitt v Hewitt: Middle America, Marvin and Common-Law Marriage,* 60 Chi B Rec 84, 88-90 (1978)."

In conclusion, we concur with the trial judge's ruling that judicial restraint requires that the Legislature, rather than the judiciary, is the appropriate forum for addressing the question raised by plaintiff. We believe a contrary ruling would contravene the public policy of this state "disfavoring the grant of mutually enforceable property rights to knowingly unmarried cohabitants". *Hewitt, supra,* 66.

The other issue on appeal is whether the trial court erred in its decision to award the custody of Mary Ellen to Constance Ward. Defendant had been granted custody of Mary Ellen following his divorce from Constance in 1968. Plaintiff moved in with the Sheldon family in 1968 and raised Mary Ellen since the child was three years old. Following the taking of testimony from all interested witnesses, including Constance Ward, the trial judge granted a change of custody to Constance Ward.

Once a judge has entered a child custody order, he should not modify or amend the award "unless there is presented *clear and convincing evidence* that it is in the best interest of the child". MCL

722.27(c); MSA 25.312(7)(c). (Emphasis added.) To determine the best interest of the child, a trial court is required to analyze and make findings of fact on the specific factors enunciated under the Child Custody Act, MCL 722.23; MSA 25.312(3), *Cooper v Cooper,* 93 Mich App 220, 226; 285 NW2d 819 (1979), *Troxler v Troxler,* 87 Mich App 520, 523; 274 NW2d 835 (1978).

This Court reviews child custody cases *de novo. Bahr v Bahr,* 60 Mich App 354, 360; 230 NW2d 430 (1975), *Outcalt v Outcalt,* 40 Mich App 392, 394; 198 NW2d 779 (1972). This independent review is meaningful, however, only if the lower court has made proper findings of fact and conclusions of law. *Lewis v Lewis,* 73 Mich App 563, 566-567; 252 NW2d 237 (1977), *Hilbert v Hilbert,* 57 Mich App 247, 250-251; 225 NW2d 697 (1974). Where the trial court specifically makes findings for each of the factors comprising the best interests of the child and the trial judge has not found against the great weight of the evidence or committed a palpable abuse of discretion, this Court will affirm. *Troxler, supra,* MCL 722.28; MSA 25.312(8).

A review of the instant record discloses that, while the trial court recognized the statutory requirement that it make findings under the Child Custody Act, it failed to do so, at least with respect to most of the factors.

In *Lewis, supra,* 567, this Court discussed the various remedies available where a trial court fails to make adequate findings of fact on the "best interest" factor:

"Where the trial court has failed to analyze the issue of child custody in accord with the mandates of MCLA 722.23; MSA 25.312(3) and to make reviewable findings of fact under GCR 1963, 517.1, the proper remedy is to

remand for a new child custody hearing. *Zawisa v Zawisa* [61 Mich App 1; 232 NW2d 275 (1975)]. While in other cases it may suffice to remand for explication of the trial court's decision, *cf. Ray v Mason County Drain Comm'r,* 393 Mich 294, 303; 224 NW2d 883, 886 (1975), the record indicates that the circumstances of the parties may have changed since entry of the custody order. We therefore determine that a new hearing is appropriate."

Therefore, we must remand this case for a new child custody hearing at which time the parties shall be allowed to introduce additional evidence pertaining to the custody issue. Following the hearing, the court shall make specific findings on each of the statutory factors relating to the best interests of the child. We believe that it is in the best interest of the child to hold a prompt hearing on her custody within 60 days from the date of release of this opinion.

Remanded. We retain jurisdiction.

Costs to abide the outcome.